1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10 | PK FENSKE-BUCHANAN, | CASE NO. C11-1656 MJP

11 | Plaintiff, | ORDER ON MOTION TO DISMISS
RE: COMPLAINT

12 | v.

13 | BANK OF AMERICA N.A., et al.,

14 | Defendant.

15

16   The Court, having received and reviewed:

17   1.  Defendants' Motion to Dismiss (Dkt. No. 13)

18   2.  Plaintiff's Opposition to Motion to Dismiss (Dkt. No. 17)

19   3.  Defendants' Reply in Further Support of Motion to Dismiss (Dkt. No. 18)

20   4.  Surreply in Opposition to Motion to Dismiss (Dkt. No. 24)

21 and all attached declarations and exhibits, makes the following ruling:

22   IT IS ORDERED that the motion to dismiss is PARTIALLY GRANTED and

23 PARTIALLY DENIED, as follows:

24

1    **Count I** *(RESPA)*          **PARTIALLY GRANTED/PARTIALLY DENIED**

2    **Count II** *(FCRA)*              **DENIED**

3    **Count III** *(TILA)*             **DENIED**

4    **Count IV** *(MLSA)*            **GRANTED**

5    **Count V** *(WLHA)*            **GRANTED**

6    **Count VI** *(WCLA)*            **DENIED**

7    **Count VII** *(WCPA)*           **GRANTED**

8    **Count X** *(Fid. duty)*          **GRANTED**

9    **Count XI** *(Defamation)*      **PARTIALLY GRANTED/PARTIALLY DENIED**

10    **Count XII** *(Conversion)*       **GRANTED**

11    **Count XIII** *(Unjust enrichment)*    **GRANTED**

12    **Count XIV** *(Neglig. misrep.)*     **GRANTED**

13    **Count XV** *(Fraud)*           **DENIED**

14    **Count XVI** *(Infl.emot.distr.)*     **GRANTED**

15    **Count XVII** *(Tax liability)*      **GRANTED**

16    **Count XVIII** *(Usury)*         **DENIED**

17

18    <u>**Background**</u> *(all citations are to Plaintiff's Original Complaint; Dkt. No. 1[1])*

19        Plaintiff executed a Note and Deed of Trust w/ Defendant Bank of America, N.A.

20    (BANA), in the amount of $1,212,000, with interest-only payments for the first 120 months. ¶¶

21    11-12. The Note included a Borrower's Right to Prepay which permitted Plaintiff to make

22

23        [1] Plaintiff has since filed an Amended and a Supplemental Complaint. Dkt Nos. 35 and 36. A review of the amended complaint reveals no change in any of the causes of action except

24    Count XVII, which has been converted to a "Negligence" claim. This order will apply with equal force to the unaltered counts of the amended complaint.

1   payments of principle before they were due.  ¶ 14.   In addition to the Deed and the Note,

2   Plaintiff was also provided with a Federal Truth in Lending Disclosure Statement ("TILA

3   Statement") which stated that no prepayment penalty would be charged for paying off the loan

4   early. ¶ 16.

5          Between March 2010 and January 2011, Plaintiff made several sizeable principal

6   prepayments.  ¶ 19.  With one exception, she alleges that the prepayments were not properly

7   applied to the principal.  The complaint charts the following timeline:

8   **3/22/10**      BANA delayed eight days before applying the payment, then applied only $184

9                    of the $199 she had submitted (Plaintiff alleges that this $15 deduction has never

10                   been explained).  ¶ 21.

11  **4/7/10**       A $1263 prepayment was properly applied.

12  **4/14/10**      Only $1564.09 of a $9500 prepayment was credited to principal; the remaining

13                   $7935.91 was treated as a periodic payment; BANA reversed this error on May

14                   11, 2010 and credited the full amount to reducing the principal (but without a

15                   corresponding interest reduction for the amount the principal should have been

16                   reduced by April 14*).*  Despite repeated requests, BANA refused to send out

17                   routine monthly loan history statements.  ¶ 24.

18  **7/6/10**       Unaware of BANA's previous errors, Plaintiff made a $9999.50 prepayment.

19                   BANA applied $2306.05 towards the principal and treated the remaining

20                   $7963.45 as a periodic payment.  Because Plaintiff had already made a periodic

21                   payment on July 1, 2010, BANA treated the remainder as a future periodic

22                   payment (i.e., forcing Plaintiff to pay for interest not yet accrued).  ¶ 25.

23

24

| | | |
|---|---|---|
| 1 | **7/13/10** | BANA applied $1998.48 of a $9950 prepayment toward principal and treated the |
| 2 | | remainder as a periodic payment.  ¶ 26. |
| 3 | **8/2/10** | Plaintiff made another prepayment of $9975.75, of which BANA applied |
| 4 | | $2035.05 towards the principal and treated the remaining $7939.80 as another |
| 5 | | "future periodic payment."  ¶ 27. |
| 6 | **1/18/11** | Plaintiff made a $100,000 prepayment -- this was initially properly applied. ¶ 30. |
| 7 | **Jan 2011** | Plaintiff received a loan history statement and discovered the misapplication of |
| 8 | | prepayments. She called customer service to report the errors and alleges that |
| 9 | | BANA commenced a "convoluted and complex series of over 70 account |
| 10 | | adjustments" to correct the problem.  However, the bank reversed the $100,000 |
| 11 | | prepayment to principal which had been correctly applied and did not correct that |
| 12 | | error until **February 28, 2011**.  ¶¶ 31-33. |
| 13 | **1/31/11** | Plaintiff sent BANA a qualified written request (QWR) letter demanding her |
| 14 | | complete loan profile.  BANA's response (February 18, 2011) did not answer |
| 15 | | Plaintiff's questions or provide her the information she requested.  The letter did |
| 16 | | include the following statement: |
| 17 | |       Please note that a credit block was placed while the issues in your letter were addressed.  However, as of the date of this letter, the block has been |
| 18 | | removed.  Further as a member of the credit granting community, Bank of America, like most creditors, relies on the accuracy and validity of the |
| 19 | | information obtained from the various reporting agencies.  Therefore, we will not remove the negative credit reporting from your credit file. |
| 20 | | |
| 21 | | Plaintiff alleges on info and belief that the effect of the negative credit reporting |
| 22 | | was to reduce her overall credit score.  ¶¶ 39-41. |
| 23 | | Plaintiff obtained a copy of her credit report, which contained the inflated balance |
| 24 | | on her loan created by BANA's failure to properly apply her prepayments.  ¶ 43. |

ORDER ON MOTION TO DISMISS RE:
COMPLAINT- 4

| | | |
|---|---|---|
| 1 | **5/5/11** | Loan history statement reflects an outstanding balance of $1,086,772.14 – with |
| 2 | | principal prepayments totaling $140,887.25, the amount should be $1,071,112.75 |
| 3 | | (not counting the further reductions in interest which would have occurred had the |
| 4 | | principal been reduced correctly in accordance with the prepayments).  BANA |
| 5 | | has "refused to account for the $15,659.39 discrepancy."  ¶¶ 34-35. |
| 6 | **Jan-Mar 2011** | Plaintiff received three separate 1098 mortgage interest statements for 2010, each |
| 7 | | reflecting different amounts of mortgage interest paid for the year.  None of the |
| 8 | | amounts listed equates to 12 monthly payments of $7,070.  ¶¶ 59-62. |
| 9 | **Feb-Aug 2011** | Plaintiff sent four additional QWRs to BANA.  BANA's responses (10 different |
| 10 | | letters) neither reflected a correction of the loan nor an explanation of their failure |
| 11 | | to do so.  Receipt of none of the four QWRs was acknowledged within five days |
| 12 | | (which Plaintiff alleges is a requirement of RESPA), nor did any of the letters |
| 13 | | identify an individual representative whom Plaintiff could contact for further |
| 14 | | assistance.  ¶¶ 45-49. |
| 15 | **9/23/11** | BANA's final response to Plaintiff's last (8/10/11) QWR failed to address her |
| 16 | | concerns ("your inquiry does not appear to be specifically related to a servicing |
| 17 | | concern related to your loan").  Additionally, in response to Plaintiff's request for |
| 18 | | a loan payoff amount, BANA provided a Payoff Demand Statement, but advised |
| 19 | | Plaintiff that "a $30.00 fee will be assessed for the payoff."  ¶¶ 54-55; Ex. G. |
| 20 | | Defendants have moved, pursuant to FRCP 12(b)(6), to dismiss the bulk of Plaintiff's |
| 21 | complaint. | |
| 22 | | |
| 23 | | |
| 24 | | |

**Standard of review**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a defendant may seek dismissal of a complaint for failure to state a claim upon which relief can be granted. To survive a motion to dismiss, a complaint need not provide detailed factual allegations. <u>Bell Atlantic v. Twombly</u>, 550 U.S. 544, 555-56 (2007) (alteration in original) (citation omitted). However, it must contain "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." <u>Id</u>. at 555. In considering a motion to dismiss, the Court must accept as true all the factual allegations in the complaint. <u>Id</u>. A complaint must proffer "enough facts to state a claim for relief that is plausible on its face." <u>Id</u>. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (citing <u>Twombly</u>, 550 U.S. at 556).

When the district court reviews the sufficiency of a complaint at the procedural stage of a motion to dismiss, "before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. To survive a motion to dismiss, a plaintiff's burden is limited to setting forth factual allegations sufficient to "raise the right to relief above the speculative level." <u>Twombly</u>, 550 U.S. at 545. A plaintiff need only plead "enough facts to raise a reasonable expectation that discovery will reveal evidence." <u>Id</u>. at 556. That is, a plaintiff must allege facts that, taken as true, are "suggestive of illegal conduct." <u>Id</u>. at 564 n.8.

**Discussion/Analysis**

Defendants are not challenging the claims for breach of contract (Count VIII) and breach of duty of good faith and fair dealing (Count IX) – they do seek dismissal of all remaining counts, and the Court will address those claims count by count.

***Count I****: Real Estate Settlement Procedures Act (RESPA)*

Plaintiff alleges the following RESPA violations:

1. <u>Deficient responses to QWRs</u>: *BANA failed to include a written explanation and a contact person, as required by the statute.*

Defendants claim that BANA did make corrections to Plaintiff's account in response to the letters and that all the letters directed her to its customer service department. This is not sufficient to support a dismissal of this count -- the statute requires that the responses to the QWR notify the borrower of the correction and include the contact information for a representative with whom the borrower can speak. 12 USC § 2605(e)(2)(C). Plaintiff adequately alleges that all the responses failed to indicate that corrections had been made or provide the contact information for a *representative* of the bank whom Plaintiff could contact. ¶¶ 39, 46. Additionally, BANA concedes that its response to Plaintiff's August 8, 2011 QWR was past the statutory deadline. Response, pp. 2-3. **DENIED.**

2. <u>Untimely acknowledgement</u>: *BANA failed to acknowledge receipt of the QWRs within five days as required by the Dodd-Frank amendment to RESPA.*

The Dodd-Frank amendment to RESPA (which includes the five-day acknowledgement requirement) states that "a section, or provision thereof, of this title shall take effect on the date which final regulations implementing such section, or provision, take effect" or that "[a] section… for which regulations have not been issued [takes effect] on the date that is 18 months after the designated transfer date…" Pub.L. 111-203 at § 1400(c)(2), (3), 124 Stat. 1376 (July 21, 2010). July 21, 2011 was set as the "designated transfer date," therefore the earliest date that the amendment could take effect is November 21, 2012. Plaintiff cites no authority for her argument that this portion of the amendment took effect immediately upon passage -- it is not apparent from the face of the statute and

1    was rejected in <u>Patton v. Ocwen Loan Servicing, LLC</u>, 2011 WL 3236026 at *4 (M.D.

2    Fla. July 28, 2011). **GRANTED.**

3    **3.** "<u>Negative credit reporting:</u>" RESPA forbids a lender from providing to a credit reporting

4    agency any information that is related to a payment dispute contained in a QWR for 60

5    days. 12 USC § 2605(e)(3). The only allegation supporting Plaintiff's assertion that a

6    "negative credit reporting" was made based on just such a dispute is her claim that she

7    received a letter from BANA indicating that the bank would "not remove the negative

8    credit reporting from [her] credit file." ¶ 40. The letter says nothing about providing

9    negative information to a credit reporting agency. Plaintiff alleges that she received a

10   copy of her credit report (¶ 43), yet cites no negative information from that report (except

11   that she disputed the loan balance).[2] **GRANTED.**

12   4. Defendants also attack Plaintiff's pleadings as failing to adequately allege a basis for

13   either actual or statutory damages. Regarding actual damages, claims of mental anguish

14   and time spent pursuing the dispute have been held sufficient to establish actual damages

15   under 12 USC § 2605(f) of RESPA (<u>Johnstone v. Bank of America, N.A.</u>, 173 F.Supp.2d

16   809, 817 (N.D. Ill., 2001).[3] And RESPA permits statutory damages (not to exceed

17   $1000) for violations representing a "pattern or practice of noncompliance with the

18   requirements of this section" (12 USC § 2605(f)(1)(B)) – Plaintiff's allegations of 13

---

20   [2] Plaintiff does allege, "on information and belief," that "the effect of the negative credit
reporting was to reduce Plaintiff's overall credit score," (¶ 41) but this is nothing more than
21   speculation, especially given that she received a copy of her credit report and alleges no actual
evidence of credit score reduction due to BANA's actions.
22   [3] Defendants cite to unpublished Ninth Circuit authority that "[a]llegations of legal fees
and the costs related to this suit are insufficient to constitute actual damages under RESPA,"
23   (<u>Solan v. Everhome Mortgage Co.</u>, 2011 WL 456013 at *3 [S.D. Cal., Feb. 3, 20111]), but the
Court does not find this persuasive -- Plaintiff is alleging more than "legal fees and costs" as her
24   damages.

1    non-responsive letters from BANA creates a plausible inference of a "pattern or

2    practice." **DENIED.**

3    ***Count II*** *(Fair Credit Report Act [FCRA])*

4    This statute requires furnishers of information to consumer reporting agencies to conduct

5    an investigation with respect to any disputed information and, if the information is found to be

6    inaccurate, to report that information to the agencies. 15 USC § 1681s-2(b). Defendants seek

7    dismissal on the grounds that the bank investigated the dispute and determined that no error was

8    made and no further corrections would be made. Response, p. 10. But Plaintiff clearly alleges

9    otherwise, and she states a proper FCRA claim with her allegation that BANA reported an

10   inaccurate loan balance to the credit reporting agencies then refused to correct it when she

11   disputed it. The fact that BANA disputes that it made a mistake doesn't entitle the bank to

12   dismissal of the claim. **DENIED.**

13   ***Count III*** *(Truth in Lending Act [TILA])*

14   Defendants first attack this claim on limitations grounds: TILA has a "one year from the

15   date of the violation" limitations period, and Defendants argue that the "violation" (failure of the

16   loan documents to mention a prepayment penalty) dates from the execution of the agreement

17   (September 7, 2007). But the Court finds that Plaintiff is entitled to equitable tolling of the

18   limitations period on the grounds that she has adequately alleged could not discover Defendants'

19   fraud until she was finally provided with a copy of the loan history statement in January 2011

20   (re: the alleged misapplication of the prepayment amounts), or until she received the payoff

21   statement in September 2011 (re: the alleged improper assessment of a prepayment penalty).

22   Equitable tolling applies in situations "where the complainant has been induced or tricked by his

23   adversary's misconduct into allowing the filing deadline to pass." O'Donnell v. Vencor, Inc.,

24

1  465 F.3d 1063, 1068 (9th Cir. 2008).  The standard is not (as Defendants claim) "active

2  concealment or misrepresentation" (Reply, p. 5),  nor does their cited authority (<u>Woods v.</u>

3  <u>Gibbons</u>, 38 Wn.App. 343, 3486 (1993)) support that argument.

4       The Court disagrees that the statutory clock started ticking when the mortgage papers

5  were executed.  The violation which is alleged here occurred at the time that the bank allegedly

6  failed to correctly apply Plaintiff's prepayments, so the clock did not begin running until the

7  bank began applying her principal prepayments to its unearned interest instead of reducing her

8  principal; i.e., sometime in early 2010.  And Plaintiff's allegations that BANA refused to provide

9  her with a loan history statement (despite repeated requests) until May 2011 makes a plausible

10  case for an "inducement" to continue making prepayments in the hope/belief that they were

11  being properly applied to the principal.  On these bases, the Court finds that Plaintiff's equitable

12  tolling argument has merit and will not dismiss this claim on limitations grounds.

13       The Court does not agree, however, with Plaintiff's position that the misapplication of the

14  prepayments constitutes a "prepayment penalty."  Plaintiff has alleged some damage due to the

15  fact that she paid interest on principal which should have been reduced by the amount of her

16  prepayments, but the Court does not find that such damage qualifies as a "prepayment penalty"

17  as that term is commonly understood.  12 CFR § 226.32 defines a "prepayment penalty" to

18  include "computing a refund of unearned interest by a method that is less favorable than the

19  actuarial method," which does not (even by analogy) fit the facts of this case.

20       Nevertheless, Plaintiff succeeds in pleading a violation of TILA, which directs that "no

21  servicer shall fail to credit a payment to the consumer's loan account as of the date of receipt,

22  except when a delay in crediting does not result in any charge to the consumer…" 15 U.S.C. §

23  1639f(a).  The Court agrees that having to pay "extra" interest on principal that should have been

24

1    reduced by a prepayment constitutes a "charge to the consumer," and that the limitations clock

2    does not begin ticking on this violation until Plaintiff receives her first loan history statement and

3    discovers the error.

4            Finally, the Court is not prepared to find that BANA's indication that it *would* charge a

5    $30 prepayment penalty in the event that the loan was paid off early constitutes an adequate

6    allegation of a TILA violation.  Plaintiff did not pay off her entire loan, the $30 "payoff fee" was

7    not assessed and she has no damages (nor does she request any form of declaratory judgment in

8    her prayer for remedies).

9            As indicated above, however, her complaint does state a claim for a TILA violation.

10   **DENIED.**

11   ***Count IV*** *(Mortgage Loan Servicing Act [MLSA])*

12          This statute concerns the obligation of lending institutions to notify borrowers when the

13   servicing for a loan is sold, transferred or assigned.  RCW 19.148.101 *et seq.*  Plaintiff appears to

14   misread the statute and claims that BANA's failure to inform her of a prepayment penalty and to

15   apply her prepayments properly are violations of this statute.  In fact, the statute penalizes failure

16   to "[i]nform the mortgagor of changes made regarding the servicing requirements" only in the

17   event that "servicing of a loan is sold, assigned, transferred, or otherwise acquired by another

18   person." RCW 19.148.030(2)(a)(iii).  Similarly, the requirement of a 15-day response to any

19   written request for information (which Plaintiff alleges in the context of all of BANA's responses

20   to her correspondence; ¶ 86) is violated only in the event of requests for information regarding a

21   sale, assignment, etc. (which Plaintiff does not allege that she made).

22          Furthermore, BANA claims that BAC Home Loan Servicing (BACHLS), as a wholly-

23   owned subsidiary of BANA, is not covered by the MLSA and no "transfer" within the meaning

24

of the statute ever took place.[4]  Plaintiff seeks leave to amend to include an allegation that she in

fact received a notice of transfer to BACHLS.  The Court will permit her to amend her

complaint, but cautions Plaintiff that the MLSA is a very narrow statute and any violations she

alleges must be solely concerned with actions (or inactions) related to the transfer.  **GRANTED.**

***Count V*** *(Washington Lending and Home Ownership Act[LHA])*

Plaintiff concedes that the violations which form the basis of her complaint were imposed

prior to the time the LHA went into effect, and concedes to dismissal of this count.  **GRANTED.**

***Count VI*** *(Washington Consumer Loan Act [CLA])*

This statute requires "residential mortgage loan servicers" to assess fees within 45 days

of their being incurred and explain them in a statement to the borrower; to credit all amounts

received immediately or notify the borrower within 10 business days if the payment has not been

credited; and to respond within 15 days to any written request from the borrower.  The response

must include the contact information for a service representative "with the information and

authority to answer questions and resolve disputes."  RCW 31.04.290.

 The parties' dispute concerning this claim centers around Defendant BACHLS.  As a

national bank which did not voluntarily license itself under this statute, BANA is exempt.  RCW

31.04.025.  Plaintiff argues that BACHLS is a "loan servicer" as defined by the statute and thus

not exempt.  But BANA claims that BACHLS's status as a "wholly-owned subsidiary" entitles it

to the same exemption that BANA enjoys, and cites Supreme Court authority that a national

bank's mortgage business is entitled to same exemption as the bank, even if it exists as an

"operating subsidiary" of the bank.  Watters v. Wachovia Banks, H.A., 550 U.S. 1, 7 (2007).

---

[4] *See* Count VI analysis for Plaintiff's motion to strike the assertion that BACHLS is a
"wholly-owned subsidiary" of BANA.

1    Plaintiff moves to strike Defendants' allegations regarding BACHLS as facts alleged (1)

2    outside of the scope of the complaint (and thus not properly considered in a 12(b)(6) motion) and

3    (2) unsupported by any sworn testimony or other admissible evidence.  The Court agrees and

4    strikes BANA's allegations regarding the status of BACHLS for purposes of this motion.

5    **DENIED.**

6    ***Count VII*** *(Washington Consumer Protection Act [CPA])*

7    Plaintiff must sufficiently allege five elements to adequately state a CPA claim:

8            1)  an unfair or deceptive act or practice that
        2)  occurs in trade or commerce,

9            3)  impacts the public interest,
        4)  and causes injury to the plaintiff in her business or property, and

10           5)  the injury is causally linked to the unfair or deceptive act.

11   Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co., 105 Wn.2d 778, 780 (1986).

12   Plaintiff's claim fails under this statute because she cannot allege an impact on the public

13   interest.  She admits that the practices of which she complains have "immediately only affected

14   [herself]," (Response, p. 14), but argues that because BANA is a "significant presence in the

15   mortgage lending industry," the Court should permit the CPA claim to proceed because the

16   practices "all have the *capacity* to impact the public interest."  Id. (emphasis supplied).  She cites

17   no authority for this proposition and she cannot prosecute this claim on the conclusory

18   speculation that the practice might be widespread.  **GRANTED.**

19   ***Count X*** *(Breach of Fiduciary Duty)*

20   Typically, lenders owe no fiduciary duty to borrowers unless there is evidence of a

21   "special relationship."  Miller v. U.S. Bank of Washington, 72 Wn.App. 416, 426-27 (1994).

22   Miller indicates that "a quasi-fiduciary relationship may exist where the lender has superior

23   knowledge and information, the borrower lacks such knowledge or business experience, the

24

ORDER ON MOTION TO DISMISS RE:
COMPLAINT- 13

1  borrower relies on the lender's advice, and the lender knew the borrower was relying on the

2  advice." Id. at 427.

3      There are no allegations that Defendants offered any "advice" to Plaintiff, and no

4  allegations which would serve to distinguish the relationship at issue here as anything other than

5  a garden variety borrower-lender relationship.  The fiduciary standard governing this relationship

6  is found in the duty of good faith and fair dealing.  **GRANTED.**

7  ***Count XI*** *(Defamation and Retaliation)*

8      Defamation requires an allegation that the defamation was communicated to someone

9  other than the person defamed; i.e., it must be "published." Pate v. Tyee Motor Inn, Inc., 77

10  Wn.2d 819, 821 (1970).  All Plaintiff alleges is that she received a letter that a "negative credit

11  reporting" would not be removed from her "file."  Furthermore, she alleges that she saw the

12  credit report and then alleges no specifics from that report that would support her allegation that

13  "negative credit reporting" equals "publication to a credit reporting agency."  Under these

14  circumstances, it is not plausible to infer that this "negative information" appeared in her credit

15  report.  **GRANTED.**

16      Regarding her retaliation claim, Plaintiff alleges that the "negative credit reporting" was

17  placed in her file in retaliation for her "good-faith" inquiry concerning the application of her

18  principal prepayments.  ¶ 126.  Defendants' only rejoinder to this is that "[t]he facts as alleged

19  illustrate that any inaccuracies... [were] the result of 'unintentional error' which BANA has

20  sought to remedy."  Motion, p. 16.  Plaintiff alleges that the misapplication of her funds was

21  systematic and deliberate, as was the placing of the "negative credit reporting." Defendants have

22  not interposed a solid argument for dismissing this portion of the claim.  **DENIED.**

23

24

1   ***Count XII*** *(Conversion)*

2          Plaintiff's theory is that Defendants' inability to account for the more than $15,000 by

3   which her principal should have been reduced amounts to conversion of her funds. This is an

4   unsupportable claim under the facts as alleged. Washington law is clear that, where an express

5   contract exists, no tort claims based on implied contractual theory will be permitted. <u>Chandler v.</u>

6   <u>Washington Toll Bridge Auth'y</u>, 17 Wn.2d 591, 604 (1943).  The case which Plaintiff cites for

7   her argument that "improper use" of funds in violation of limited authority amounts to

8   "conversion" (<u>D</u>avenport v. WEA, 147 Wn.App. 704, 722-23 (2008)) is not a case involving

9   parties to a contractual relationship and so must be distinguished.  Plaintiff must look to her

10  contractual remedies regarding the missing money.  **GRANTED.**

11  ***Count XIII*** *(Unjust enrichment)*

12         This cause of action fails on the same grounds as Plaintiff's conversion claim: no implied

13  contractual remedies are available where the complainant is a party to an express contract.

14  **GRANTED.**

15  ***Counts XIV – XVI*** *(Economic loss rule/independent duty doctrine)*

16         Defendants attack these three counts (negligent misrepresentation, fraud and

17  negligent/intentional infliction of emotional distress) as a group on the basis of the "economic

18  loss" rule, which precludes tort recovery for a purely economic loss within a contractual

19  relationship unless an independent duty can be established.  <u>Eastwood v. Horse Harbor Fdn.,</u>

20  <u>Inc.</u>, 170 Wn.2d 380, 393 (2010).

21         The Court cannot agree that the economic loss rule suffices to dispose of these claims.

22  First of all, as the <u>Eastwood</u> court pointed out, "economic loss rule" is a misnomer in the sense

23  that the existence of economic loss does not in and of itself mandate dismissal of any tort claims

24

1   just because a contractual relationship exists.  "Economic losses are sometimes recoverable in

2   tort, even if they arise from contractual relationships."  Id. at 1261.  The list of torts which may

3   successfully be plead in a contract case include those which Defendants challenge here.

4         Nor is it, as Defendants argue, fatal to Plaintiff's tort claims that she relies on the same

5   set of facts from which her contractual claims are drawn.  The issue is whether Defendants'

6   behavior in the course of discharging their contractual duties to Plaintiff invokes tort duties

7   independent of their contractual obligations.  "[T]he existence of a duty is a question of law and

8   depends on mixed considerations of logic, common sense, justice, policy, and precedent."  Id. at

9   1262 (citations omitted).  There is unquestionably precedent for Plaintiff's tort claims.  *See*

10  Eastwood at 1261 for a list of the Washington cases which have upheld claims for fraud,

11  negligent misrepresentation and infliction of emotional distress.

12  ***Count XIV/XV (Negligent misrepresentation/fraud)***

13        Questions of independent duty aside, Plaintiff's negligent misrepresentation count will be

14  dismissed as a matter of law; Plaintiff's allegations do not give rise to a plausible inference of

15  "negligence."  Plaintiff herself argues that "Defendants' failure to apply her payment to principal

16  or to apply the funds at all is a pattern and practice of *willful* conduct that is and was intended to

17  bring gain to the Defendants."  Response, p. 19 (emphasis supplied).  Since one of the elements

18  of the tort of negligent misrepresentation is that the defendant was "*negligent* in obtaining or

19  communicating false information" (Lawyers' Title Ins. Co. v. Baik, 147 Wn.2d 536, 545 (2002);

20  emphasis supplied), this claim fails as a matter of law.  **GRANTED.**

21        The Court finds that Plaintiff's fraud claim, however, is adequately plead (i.e, Plaintiff

22  alleges the specifically misleading portions of the contract, alleges that Defendants acted with

23  intent to mislead, alleges that she was mislead and alleges her damages with sufficient

24

ORDER ON MOTION TO DISMISS RE:
COMPLAINT- 16

1    particularity).  Further, "logic, justice and policy" dictate that if Plaintiff can prove that

2    Defendants acted with fraudulent intent in misapplying her prepayments of principal, then that

3    would constitute the violation of a duty independent of Defendants' contractual obligations to

4    her.  **DENIED.**

5    *County XVI (Negligent and intentional infliction of emotional distress)*

6           Like her negligent misrepresentation claim, Plaintiff's "infliction of emotional distress"

7    claims fail as a matter of law.  These causes of action require allegations of conduct that is "so

8    outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency,

9    and to be regarded as atrocious, and utterly intolerable in a civilized community." Kloepfel v.

10   Bokor, 149 Wn.2d 192, 195 (2003).  While Plaintiff does plead that she spent "countless,

11   stressful hours" trying to get BANA to correct their errors (¶ 154), that she has endured "great

12   mental anguish" and is "overwrought with concern and worry that the payments will never be

13   accurately applied" (¶ 155), this behavior and these circumstances do not rise to a level of

14   "atrocity," indecency, and "utter intolerability."

15          To quote Judge Robart of this district, the bank's actions "may be problematic, troubling,

16   or even deplorable, but these actions do not involve physical threats, emotional abuse, or other

17   personal indignities aimed at [Plaintiff]." Vawter v. Quality Loan Service Corp. of Washington,

18   707 F.Supp.2d 1115, 1128 (W.D.WA 2010).  By extension, neither logic nor justice dictate that

19   the Defendants' actions should subject them to allegations of violating a duty independent of

20   their contractual responsibilities to Plaintiff in this particular regard. **GRANTED.**

21   *County XVII (Tax fraud liability)*

22          Defendants assert that there is no recognized cause of action for "exposure to tax fraud

23   liability."  Furthermore, Plaintiff does not allege that she was audited or that she even filed a

24

false tax return.  Plaintiff concedes that she has not adequately plead this claim and intends to amend the complaint.  **GRANTED.**

**_Count XVIII_** _(Usury)_

The elements of usury at common law require the allegation of:

1. a loan (express or implied),
2. the subject matter of which is money;
3. a mutual understanding that the principal shall be absolutely repayable;
4. "the exaction of something in excess of what is allowed by law for the use of the money loaned;" and
5. "an intent to exact more than the legal maximum for the loan"

Stevens v. Security Pacific Mortgage, 53, Wn.App. 507, 514 (1989).

Plaintiff's allegation that Defendants utilized her prepayment funds to pay off interest which had not yet accrued satisfies the definition of "an exaction… in excess of what is allowed by law."  Defendants' argument to the contrary notwithstanding (see Mtn., pp. 23-24), Plaintiff has in fact plead that Defendants' actions reflected the requisite intent.  *See* ¶¶ 35, 57 and 70.

Plaintiff further argues that, as a "loan servicer," BACHLS is subject to requirements of the Consumer Loan Act, one of which prohibits loan servicers from charging "interest… in advance or compounded."  RCW 31.04.015(28).  Plaintiff contends that the use of the prepayment funds for "future periodic payments" constitutes the payment of "interest in advance" and thus "in excess of what is allowed by law."  The Court finds that this allegation describes a practice which falls under the definition of "usury."  **DENIED.**

**Conclusion**

The following counts will be dismissed: Count IV (MSLA), Count V (LHA), Count VII (CPA), Count X (fiduciary duty), Count XII (conversion), Count XIII (unjust enrichment), Count XIV (negligent misrepresentation), Count XVI (infliction of emotional distress) and Count XVII (tax fraud liability).

1       Where noted in the order, the Court grants Plaintiff leave to amend her complaint.

2

3       The clerk is ordered to provide copies of this order to all counsel.

4       Dated April 11, 2012.

5

6

7       _____
        Marsha J. Pechman
8       United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

ORDER ON MOTION TO DISMISS RE:
COMPLAINT- 19